UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

J.L. and M.L. and their minor daughter, K.L.,

Plaintiff(s),

v.

MERCER ISLAND SCHOOL DISTRICT,

Defendant(s).

NO. C06-494P

ORDER ON PETITION FOR JUDICIAL REVIEW

The above-entitled Court, having received and reviewed:

1. Plaintiffs' Opening Brief (Dkt. No. 10)

2. District's Amended Brief (Dkt. No. 15)

3. Plaintiffs' Reply Brief (Dkt. No. 18)

and all exhibits and declarations attached thereto, makes the following ruling:

IT IS HEREBY ORDERED that the case is REMANDED to the Administrative Law Judge (ALJ) for new findings of fact and conclusions of law in conformance with this opinion.

IT IS FURTHER ORDERED that Plaintiffs, as the prevailing parties in this action, are awarded attorney's fees and costs.

**Background**[1]

This case concerns the application of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. and 34 CFR Part 300 et seq., and the implementing state regulations (WAC 392 et seq.).

---

[1] The facts in the Background section are drawn from the ALJ's Findings of Facts and the Fact sections contained in the briefing of both parties.

**ORD ON PETITION
FOR JUD REVIEW - 1**

K.L. is a 17 year-old of average intelligence with severe learning disabilities, primarily affecting her ability to read and write. She attended public school in the Defendant Mercer Island School District (MISD) through the 3rd grade, private school for 4th and 5th grade, then returned to the public system in the 6th grade. Prior to the commencement of 10th grade, Plaintiffs J.L. and M.L. (Parents) unilaterally removed her from MISD and enrolled her in the Landmark School, a private residential educational facility in Massachusetts where she remains at present. At issue in this action are the Individualized Education Plans (IEPs) developed for K.L.'s 8th, 9th and 10th grade education, in which Parents allege they were denied adequate participation; Parents further allege that the IEPs failed to meet the requirements of the IDEA, resulting in a failure to provide K.L. with a free appropriate public education (FAPE).

8th Grade (2002-2003): K.L.'s 8th grade IEP called for special instruction in reading, writing and math and accommodations included a peer notetaker, peer/adult reader, oral exams, extended time for testing and assignments, reduced assignments and the use of a calculator. At the end of her 8th grade year, K.L. scored in the 2nd percentile on the Iowa Test of Basic Skills and failed the Washington Assessment of Student Learning (WASL) in the only area in which she was tested; her Wechsler Individual Achievement Test (WIAT) results showed her to have fallen further behind her classmates than when she was tested 3 years earlier. A June 2003 "reevaluation report" was prepared reflecting these findings – it was not shared with Parents upon its completion or at the June 10, 2003 IEP meeting where K.L.'s 9th grade IEP was developed. The MISD report on K.L.'s progress in 8th grade reflected that she had met 0 of 3 IEP objectives in writing, and 2 of 4 in reading.

9th Grade (2003-2004): K.L.'s IEP was essentially unchanged from her 8th grade plan, with the same specialized instruction and accommodations (plus an additional hour of "reading assistance" per day). Standardized reading tests (Gates-MacGinitie) administered in January and June of 2004 resulted in scores in the 1st percentile for her age (these results were also not shared with Parents).

**ORD ON PETITION**
**FOR JUD REVIEW - 2**

K.L. met 0 of 3 of her IEP writing objectives for this grade, and 1 of 3 reading objectives.  Parents reported a steep decline in their daughter's self-esteem and confidence with a corresponding reluctance to participate in her education during this time.

<u>Proposed IEP #1 for 10th grade (2004-2005)</u>: MISD's IEP for K.L.'s 10th grade year called for specialized instruction in reading, writing, math and study skills (but did not, Parents point out, specify the methodologies to be used or time to be devoted to each).  At the IEP meeting, MISD failed to staff the meeting with the general education teacher called for by the regulations.  Transitionally, the IEP contemplated that K.L. would attend "community college/college" and engage in "competitive employment," and noted that the MISD's program "is aimed at [K.L.] attending a community or technical college," while Parents were investigating colleges for her.[2]

<u>IEE of K.L./Enrollment in Landmark (Summer 2004)</u>: In June 2004, MISD paid for an independent educational examination (IEE) of K.L. by Dr. Hill, a neuropsychologist.  Dr. Hill concluded that K.L. had phonological (sound to letter) and morphological (word families/routine parts of words) deficiencies and required intensive reading intervention in these areas.  Hill also diagnosed K.L. as exhibiting a "mood disorder."  She recommended a specialized instructional setting that could address K.L.'s language-based learning difficulties, and endorsed Landmark School, a private residential facility in Massachusetts, as an appropriate placement. In August 2004, Parents notified MISD that they were sending K.L. to Landmark.  (Prior to this time, MISD had tried to get Parents' consent for an evaluation by Children's Hospital; consent was not forthcoming.)

<u>Proposed IEP #2 for 10th grade</u>: In September 2004, MISD produced another IEP for the 2004-2005 year.  The IEP team met with Dr. Hill, agreed with some of her conclusions (and adopted some of her recommendations about reading instruction for K.L.), but did not agree with her ultimate

---

[2] In fact, MISD staff acknowledged during the hearing that the District's focus for K.L. was a "career track;" i.e., post-secondary education along the lines of a technical or vocational school. (AR 2747, 2748)

**ORD ON PETITION**
**FOR JUD REVIEW - 3**

conclusion regarding the nature of K.L.'s disability; the IEP included all the accommodations from IEP #1, and made some changes to that plan without adopting Dr. Hill's recommendation about a Landmark placement.

<u>November 2004 Evaluation by District Experts</u>: K.L. returned home on a break from Landmark and was evaluated by two MISD experts from Children's Hospital, Dr. Breiger and Ms. Moering.  They concluded that K.L. did not have a language-based learning disorder and did not require the type of reading program offered by Landmark.  An evaluation by psychiatrist Dr. Golden resulted in a finding of no mood disorder.

<u>March 2005 Reevaluation and IEP</u>: Prior to this meeting, Parents provided a statement of what they believed (based on input from Dr. Hill and Landmark staff) should be included in the IEP.  MISD held a "pre-meeting meeting" with its staff (Parents allege that the meeting resulted in a predetermination to reject the Hill/Landmark findings and recommendations; the ALJ did not so find).  The IEP adopted some of Dr. Hill's recommendations and all of the recommendations of the Children's Hospital experts.  As presented by MISD at the March 11, 2005 meeting, the IEP included an increased list of accommodations and conformed to the assessment of the District experts that K.L. did not have a phonologic disorder which required special attention; it did not allocate time for specific activities nor did it indicate which specific methodologies would be used to accomplish its goals.

<u>Due process/administrative hearing</u>: Parents sought compensation from MISD for the cost of K.L.'s out-of-state placement, on the grounds of the inadequacy of both her previous and proposed educational programs.  When MISD refused, Parents sought an administrative review of that determination.  Following 12 days of hearings, the ALJ found in favor of the District.  Her findings (from which Parents appeal) are summarized as follows:

- The June 2003 and March 2005 evaluations were appropriate

**ORD ON PETITION**
**FOR JUD REVIEW - 4**

- The special education programs provided by MISD from 2002-2004 and proposed for K.L. in 2004-2005 were appropriate.
- MISD's evaluations and IEPs provided K.L. with FAPE.
- Parents were not entitled to reimbursement for the Landmark placement, or compensation for K.L.'s prior education.

Parents seek a declaratory judgment that MISD denied K.L. the FAPE required by IDEA because the District:

1. Denied Parents full participation in K.L.'s evaluation and program development
2. Inappropriately evaluated K.L. in June 2003 and March 2005
3. Developed inadequate and inappropriate IEPs from 2002 to present
4. Provided inadequate and inappropriate special education programs for K.L. in 8th and 9th grade, and proposed an inadequate program for 10th grade

Parents are further seeking a declaratory judgment that MISD caused K.L. lost educational opportunities, that Landmark is an appropriate placement and that Parents are entitled to reimbursement of all costs associated with the placement and with bringing this action.

**Discussion**

Standard of review

The court reviews an IDEA administrative decision on "the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(B)(iii). The deference accorded to the ALJ's decision is based on whether the Court deems that the hearing officer's findings are "thorough and careful." Capistrano Unified School District v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995), *citing* Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994). Conclusions of law or mixed questions of fact and law are reviewed *de novo* unless the mixed question is primarily factual (Gregory K. v. Longview Sch. Dist., 811 F.2d

**ORD ON PETITION
FOR JUD REVIEW - 5**

1307, 1310 (9th Cir. 1987)), and the court "is free to accept or reject the findings in part or in whole." Capistrano, *supra* at 891.

The Court would characterize the ALJ's findings in this matter as "thorough, but not careful." The ALJ exhaustively examined the evidence presented, but she misunderstood the intention of the IDEA, misapplied the statute and failed to uphold its requirements. It is hoped that on remand, with the benefit of the analysis below, the rationale and ruling of the ALJ will incorporate and reflect the intention and prescription of IDEA.

<u>IDEA's "meaningful benefit" requirement</u>

" . . .[W]e agree that the IDEA requires an IEP to confer a "meaningful educational benefit" gauged in relation to the potential of the child at issue. . . At the very least, the intent of Congress appears to have been to require a program providing a meaningful educational benefit toward the goal of self-sufficiency." <u>Deal v. Hamilton County Bd. of Educ.</u>, 392 F.3d 840, 862, 864 (6th Cir. 2004).

A core issue in this proceeding is whether MISD and the ALJ applied the correct standard for the determination of whether K.L. was receiving a "meaningful educational benefit" from the programs developed for her and implemented by the District. A review of the statutes and cases indicates that they did not, and Parents are correct that the failure of the IEPs to focus on progressing K.L. toward self-sufficiency (i.e., independent living) and her desired goal of post-secondary education represents a failure to confer the benefit contemplated by the IDEA.

It is important to note that the law regarding "disability education" underwent a change about ten years ago. Prior to that time, the statutory scheme was the Education for Handicapped Children Act of 1975 (EHA), the purpose of which was solely to provide <u>access</u> to education for disabled students who had been marginalized in the public school system. Satisfied that the goal of "access" had been reached, in 1997 Congress enacted the IDEA with the express purpose of addressing implementation problems resulting from "low expectations, and an insufficient focus on applying

replicable research on proven methods of teaching and learning for children with disabilities." 20 U.S.C. § 1400(c)(4). The statute clearly stated its commitment to "our national policy of ensuring equality of opportunity, full participation, *independent living, and economic self-sufficiency* for individuals with disabilities." 20 U.S.C. § 1400(c)(1) (emphasis supplied).

This represented a significant shift in focus from the disability education system in place prior to 1997. In defining the applicable standard, the District and the ALJ place much reliance on the Supreme Court case of <u>Hendrick Hudson District Bd. of Education v. Rowley</u>, 458 U.S. 176 (1982), a case which interprets the EHA. To the extent that the Supreme Court at that time was interpreting a statute which had no requirement (1) that programming for disabled students be designed to transition them to post-secondary education, independent living or economic self-sufficiency or (2) that schools review IEPs to determine whether annual goals were being attained, the Court must consider that opinion superseded by later legislation, and the District's and ALJ's reliance on it misplaced.

The IDEA is not simply about "access;" it is focused on "transition services,. . . an *outcome-oriented* process, which promotes movement from school to post-school activities. . . taking into account the student's preferences and interests." 20 U.S.C. § 1401(30); 34 CFR § 300.29 (emphasis supplied). This is such a significant departure from the previous legislative scheme that any citation to pre-1997 case law on special education is suspect.

The federal regulations interpreting IDEA speak to increased focus on self-sufficiency:

> . . . [O]ne of the key purposes of the IDEA Amendments of 1997 was to 'promote improved education results for children with disabilities through. . . educational experiences that prepare them for later education challenges and employment.' (H.Rep. No. 105-95, p. 82 (1997); S.Rep. No. 105-17, p. 4 (1997)).
> Thus, throughout their preschool, elementary, and secondary education, the IEPs for children with disabilities must. . . focus on providing instruction and experiences that enable the child to prepare himself or herself for later educational experiences and for post-school activities, including formal education, if appropriate, employment and independent living.

**ORD ON PETITION
FOR JUD REVIEW - 7**

1  64 Fed.Reg. 12470. 12474.  It is hard to read the District's briefing or the ALJ's findings (with their

2  emphasis on "accommodations" for K.L.'s disabilities and "more than de minimis progress" toward

3  stated goals[3], as opposed to actual attainment of those goals) and not conclude that they missed the

4  point of the IDEA.

5        Disability education case law repeatedly emphasizes the necessity of deriving a "meaningful

6  educational benefit" from the programs provided pursuant to the IDEA.  <u>Deal v. Hamilton Co.</u>, *supra*;

7  <u>M.L. v. Federal Way School District</u>, 387 F.3d 1001, 1126 (9th Cir. 2004);  <u>Adams v. State of Oregon</u>,

8  195 F.3d 1141, 1149 (9th Cir. 1999).  The American Heritage Dictionary of the English Language (4th

9  ed., Houghton Mifflin, 2000) defines "meaningful" as: "1. Having meaning, function or *purpose*.  2.

10  Fraught with meaning, *significant*" (emphasis supplied).

11        Viewed through the lens of that definition, the Court finds that providing a "meaningful

12  educational benefit" under the IDEA requires programs and results which reflect the Act's emphasis

13  on preparation for self-sufficiency.  Contrast that requirement with the ALJ's findings on the requisite

14  benefit:

15  > The substantive test of *Rowley* does not require the absolutely best or "potential maximizing" education for the individual child[4], but the benefit must be real and measurable. . . "[T]he basic floor of opportunity provide by the Act consists of access to specialized instruction and related services. . ."  *B.S.*, 82 F.3d at 1500; *Rowley*, 458 U.S. at 201.  However, a FAPE is provided if the student derives more than minimal or trivial progress in a placement. . . (*citations omitted*). [CL 47, AR 365]

> When a child is in a mainstream class, the "attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Capistrano*, 59 F.3d at 896.[5] [CL 49, AR 365]

> The District is not required by the IDEA or this jurisdiction to "maximize" a Student's potential.  Rather, the standard is whether the program provided by the District was reasonably

---

[3] Def Brief, pp. 4, 9, 14, 18 (fn. 14), 30; CL 47, 49, 63 64.

[4] Parents do not dispute this.

[5] A 1995 (pre-IDEA) case.

**ORD ON PETITION**
**FOR JUD REVIEW - 8**

> calculated to provide educational benefit. The preponderance of the evidence establishes the Student made progress each academic year. . . Therefore, the ALJ concludes that the District's IEPs were reasonably calculated and provided educational benefit. [CL 55, AR 366].
>
> The progress [K.L.] made while attending school in the District was more than de minimis. [CL 63, AR 368]

These are not the standards of the 1997 IDEA, which is not concerned merely with "access to specialized education," making annual progress that is "more than de minimis" or whether the benefit is simply "measurable." In focusing on <u>Rowley</u> and the pre-IDEA measures of successful specialized education, the District and the ALJ have set the bar too low.

By way of example, it is clear from the Grade 8 - 10 IEPs and the testimony of the District Staff that MISD relied heavily on "accommodations" for K.L. (basically, someone to read to her or write for her). *See* Pltfs Brief, n. 32. This allowed her to "progress" through the material, but is totally at odds with the IDEA goals of self-sufficiency and independent living. Employing accommodation and other compensatory strategies without increasing a student's skill level does not represent compliance with the IDEA; it is not sufficient to simply "escort" an educationally challenged student through the school system.

The District contends, without citation to expert authority, that accommodations are a lifelong requirement for "incurable" diseases like dyslexia. Def. Brief, p. 30. While some form of accommodation may well be a long-term component of K.L.'s functioning, the emphasis on it in the District's educational plans and the ALJ's analysis is at odds with the focus and purpose of the IDEA.

The Court notes that the District does argue in its briefing (§6, pp. 30-33) that "MISD's IEP were consistent with IDEA's goals of independence and self-sufficiency," but the ALJ made no finding in this regard and clearly did not consider those goals a criteria for compliance with the IDEA.

On remand, the Court orders the ALJ to focus her analysis on whether the District's approach to K.L.'s educational challenges met the IDEA standard of "equality of opportunity, full participation,

independent living, and economic self-sufficiency" for the minor and whether the programs developed for her conferred a "meaningful educational benefit" in light of the IDEA's goals. Case law supports and this Court encourages the ALJ to consider the progress that K.L. made while at Landmark[6] in assessing (1) whether the IEPs were adequately developed and implemented and (2) what an appropriate placement and/or appropriate remedy is in this matter.

The results of the student's education at the private placement may be considered in deciding whether the District IEPs provided a meaningful benefit to the minor. The Ninth Circuit has previously endorsed the approach of considering a student's nonpublic school performance in assessing whether the minor is capable of achieving certain goals. Ojai Unified School District v. Jackson, 4 F.3d 1467, 1476 (9th Cir. 1993); *see also* Capistrano Unified Sch. District, 59 F.3d 884, 889-890 (9th Cir. 1995). The ALJ is clearly entitled to consider whether the District IEPs were effective in light of the results of K.L.'s Landmark education.

IDEA: IEPs, Goals & Methodologies

As a further aid to fashioning a remedy for Plaintiffs below, the Court finds that the IEPs themselves did not comply with the IDEA. The statute calls for school districts to provide their staff with sufficient "professional development" to "ensure that they have the skills and knowledge necessary to enable [students] to *meet* developmental goals. . . and to be prepared to lead productive, *independent* adult lives, to the maximum extent possible. . ." 20 U.S.C. § 1400(c)(5)(E)(i)(ii) (emphasis supplied). The language speaks to the *attainment* of goals set for each child, not merely "progress" toward them.

The section of the statute concerning IEPs conforms to this intention:

---

[6] *See* Pltfs Opening Brief for a summary of the rather remarkable gains that K.L. experienced in her first year in the private placement. Pltfs Brief, pp. 11-13. As reflected in a multitude of tests, the minor made significant advances in reading, writing and other literacy skills, progressing in areas where the District's IEPs had failed to improve her abilities.

**ORD ON PETITION
FOR JUD REVIEW - 10**

> . . . 'IEP' means a written statement for each child with a disability. . . that includes. . . (ii) a statement of measurable annual goals, including benchmarks or short-term objectives. . ." (iii) a statement of the special education and related services. . . that will be provided for the child (I) to advance appropriately toward attaining the annual goals... [and] (viii) a statement of. . . (II) how the child's parents will be regularly informed. . . of. . . (bb) the extent to which [the child's] progress is sufficient to enable the child to achieve the goals by the end of the year.

Id. at § 1414(1)(A). The IEP team is to review the child's IEP at least "annually to determine whether annual goals for the child are being *achieved*. . ." Id. at §1414(4)(A)(i) (emphasis supplied.)

At the state implementation level, the IEP must be revised "as necessary. . . if annual goals are not *achieved*." WAC 392-172-156. The state regulations affirm that the student is entitled to "[t]he placement option(s) that provides a reasonably high probability of assisting the student to *attain* his or her annual goals." WAC 392-172-180(2)(c) (emphasis supplied).

Additionally, there is statutory and regulatory language which delineates further IEP requirements that:

1. "The amount of services to be provided must be stated in the IEP. . . The amount of time to be committed to each of the various services to be provided must be (1) appropriate to the specific service, and (2) stated in the IEP in a manner that is clear to all who are involved in both the development and implementation of the IEP." 34 CFR 300.347(a)(6); Interpretation, 64 Fed Reg. 12,478.

2. "[T]he particular teaching methodology that will be used. . . will need to be discussed at the IEP meeting and incorporated into the student's IEP." Interpretation, 64 FedReg. 12,552.

In its response, the District makes some attempt to distinguish the case law Parents cite (regarding "meaningful educational benefit") but makes no argument which either disputes the intent of the legislative scheme or the import of this statutory language. Given the fact that K.L. failed to attain her reading or writing objectives for the 8th and 9th grade years (meeting 0 of 6 objectives in writing and 3 of 7 in reading; FF 57, 58, 90, 92) there can hardly be an argument that (regardless of

ORD ON PETITION
FOR JUD REVIEW - 11

the "progress" that K.L. made during those years) she <u>attained</u> the goals the District had incorporated into her IEP.  While the IDEA does not mandate that the District achieve every goal set for every student, it does require that the student's IEP address the failure to achieve previously set goals and develop plans to address those shortfalls in the following year.  Furthermore, those goals must be consonant with the overarching intent that the student be guided toward self-sufficiency.  The Court finds that the District's IEPs for the period in question did not comply with the statutory requirements and intents enumerated *supra*.

The District does not contest Parents' allegations that the IEPs failed to specify the methodologies to be used and the time allotted to the various services K.L. was to be provided; nor do the ALJ's findings suggest that the program plans for K.L. either discussed the amount of time to be committed to the various services she was to be provided, or incorporated any particular teaching methodology into the IEP.

In view of the commentaries on the federal regulations cited above, these failures place the IEPs in violation of the statutory requirements.  The Court finds that the IEPs for K.L.'s 8th, 9th, and 10th grade years did not meet the requirements of the IDEA or the state implementation regulations.  The result is that, for the 8th and 9th grades, K.L. did not receive the FAPE to which she was entitled.  On that basis, the Court also concludes that, had K.L. remained at MISD for the 10th grade under the plan developed by the District, she would not have received a FAPE for that year as well.

**Remand**

While the above analysis does dictate a finding that the District's IEPs for K.L. were deficient and the minor was thereby denied a FAPE for the years in question, the Court declines Parents' invitation to make an independent determination of the appropriate educational program or placement for their daughter, or of the exact nature of the compensatory educational remedy to which she is entitled.  The ALJ personally heard and/or reviewed a vast amount of evidence in this matter and is in a much better position to evaluate the weight and sufficiency of the competing expert opinions and

other testimony and to fashion a suitable remedy in accordance with this Court's findings on the intent and requirements of the IDEA.

Based on the Court's analysis and findings, some form of compensatory educational relief is owed to Parents and the minor student. The exact nature of that relief is best left to the hearing officer with the most direct and extensive acquaintance with the facts and opinions in this case.

**Prevailing Parties**

Despite the fact that this matter is being remanded and Parents did not receive all the relief which they sought in this action, the Court finds that they are the prevailing parties, having achieved a significant proportion of their requested relief. On that basis, the Court awards them their costs and attorney's fees in bringing this action.

**Conclusion**

The IDEA calls for disability education programs which guide the student toward post-education independence and self-sufficiency. In pursuit of that goal, students such as K.L. must receive educational opportunities which significantly advance them towards that end. The IEPs developed in accordance with this statutory scheme must specifically delineate the methodologies to be used to achieve these goals and the time to be allotted to each of the services employed to that end and further must be geared toward the achievement of enumerated goals. Where a previous year's IEP has fallen short of the marks it set, the succeeding IEPs must identify the means to advance the student further.

The IEPs for K.L.'s 8th, 9th and 10th grade years were deficient in their failure to adhere to the IDEA requirement for specialized education aimed at achieving independence and self-sufficiency for the student and to provide "meaningful (i.e., significant) educational benefits" in that regard. The absence of any specification of teaching methodologies and time allotments to various services represents a further IDEA violation.

The matter is remanded to the Administrative Law Judge for findings and relief consistent with the analysis contained in this order. Plaintiffs are directed to submit an order for their costs and attorney's fees.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: December _8___, 2006

*[signature]*

Marsha J. Pechman
U.S. District Judge

**ORD ON PETITION
FOR JUD REVIEW - 14**